## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARY BARBATO,             :
           Plaintiff      :     CIVIL ACTION NO. 3:13-CV-2748
                       :     (Judge Nealon)
     v.                :
                       :
GREYSTONE ALLIANCE, LLC, :
ET AL.,                 :
          Defendants  :

### MEMORANDUM

On October 7, 2013, Plaintiff, Mary Barbato, brought an action against Defendant Greystone Alliance, LLC ("Greystone") in the Court of Common Pleas of Wayne County, Pennsylvania. (Doc. 2). On November 8, 2013, Greystone removed the action to this Court. (Doc. 1).

On January 28, 2014, Plaintiff moved to amend her complaint, which was granted on June 13, 2014. (Docs. 11, 20). On that same date, Plaintiff filed an amended complaint against Defendants Greystone; Turning Point Capital, Inc. ("Turning Point"); and Crown Asset Management, LLC ("Crown") alleging violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA"). (Doc. 21). In particular, Plaintiff claims that Defendants violated sections 1692e(11) and 1692g of the FDCPA. (Id. at pp. 4-6). Additionally, Plaintiff advances class allegations as to the section 1692g claim. (Id. at pp. 5-6). To date, Greystone and Turning Point have been dismissed from the action.

(Docs. 66, 99).

On January 15, 2016, Plaintiff moved to certify the class. (Doc. 64). On April 14, 2016, Plaintiff filed a motion seeking a ruling on her class certification motion prior to ruling on her motion for summary judgment. (Doc. 76). On April 15, 2016, each remaining party, Plaintiff and Crown, moved for summary judgment. (Docs. 77, 78).

On May 19, 2016, Plaintiff filed a reply in support of her motion seeking a ruling on her class certification motion prior to a ruling on her motion for summary judgment. (Doc. 93). In the reply, Plaintiff stated that she no longer sought "a ruling on Plaintiff's motion for class certification prior to a ruling on Plaintiff's motion for summary judgment on liability." (Id. at p. 2). "With [Crown]," Plaintiff requested "that the Court rule on the parties' cross-motions for summary judgment in advance of Plaintiff's motion for class certification." (Id.). As a result, the Court issued an Order deeming Plaintiff's April 14, 2016 motion for a ruling on her class certification motion prior to ruling on her motion for summary judgment withdrawn. (Doc. 97); see (Doc. 93, p. 2). The Order also states that the Court will defer ruling on, inter alia, Plaintiff's motion for class certification until after disposition of the parties' respective motions for summary judgment. (Doc. 97).

Each pending summary judgment motion has been fully briefed and, thus, both are ripe for disposition. <u>See</u> (Docs. 79-80, 83-87, 90-91, 94-96). For the reasons stated below, both summary judgment motions will be denied.

## I.   <u>STANDARD OF REVIEW</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); <u>Turner v. Schering-Plough Corp.</u>, 901 F.2d 335, 340 (3d Cir. 1990). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Once this showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990). "[T]he non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial." <u>Shank v. Experian Info. Solutions, Inc.</u>, 2016 U.S. Dist. LEXIS 2679, at *1 (M.D. Pa. Jan. 11, 2016) (Jones, J.) (citing <u>Guidotti v. Legal Helpers Debt Resolution, L.L.C.</u>, 716 F.3d 762, 773 (3d Cir. 2013)). In particular, for a non-moving party to prevail on a motion for summary

judgment, they "'must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial.'" McGlynn v. Reliance Standard Life Ins. Co., 2015 U.S. Dist. LEXIS 168589, at *9-10 (M.D. Pa. Dec. 17, 2015) (Caputo, J.) (quoting Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007)). "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli, 490 F.3d at 270 (quoting Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).

All inferences "should be drawn in the light most favorable to the nonmoving party, and where the nonmoving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Pastore v. Bell Tel. Co., 24 F.3d 508, 512 (3d Cir. 1994) (quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993)). "[T]he non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists." Swinka Realty Invs., LLC v. Lackawanna Cnty. Tax Claim Bureau, 2016 U.S. Dist. LEXIS 86328, at *20-21 (M.D. Pa. July 1, 2016) (Mariani, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  Pursuant to Federal Rule of Civil

Procedure 56:

> A party asserting that a fact cannot be or is genuinely disputed
> must support the assertion by citing to particular parts of
> materials in the record . . . or by showing that the materials
> cited do not establish the absence or presence of a genuine
> dispute, or that an adverse party cannot produce admissible
> evidence to support the fact.

FED. R. CIV. P. 56(c)(1)(A)-(B).  Additionally, "[i]n evaluating whether summary

judgment should be granted, '[t]he court need consider only the cited materials,

but it may consider other materials in the record.'"  FED. R. CIV. P. 56(c)(3).

Further, the summary judgment standard "is no different where," as in this

case, "there are cross-motions for summary judgment."  Lawrence v. City of

Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008).  When a court is "'confronted with

cross-motions for summary judgment, the court must rule on each party's motion

on an individual and separate basis, determining, for each side, whether a

judgment may be entered in accordance with the summary judgment standard.'"

Swinka Realty Invs., LLC, 2016 U.S. Dist. LEXIS 86328, at *22 (quoting

Marciniak v. Prudential Fin. Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir.

2006)).  According to the United States Court of Appeals for the Third Circuit:

> [c]ross-motions are no more than a claim by each side that it
> alone is entitled to summary judgment, and the making of such
> inherently contradictory claims does not constitute an
> agreement that if one is rejected the other is necessarily

> justified or that the losing party waives judicial consideration
> and determination whether genuine issues of material fact exist.

Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241,

245 (3d Cir. 1968)); Holton v. Huff, 2012 U.S. Dist. LEXIS 53185, at *5 (M.D.

Pa. Apr. 16, 2012) (Mariani, J.). On cross motions for summary judgment, "[e]ach

movant must show that no genuine issue of material fact exists; if both parties fail

to carry their respective burdens, the court must deny the motions." Holton, 2012

U.S. Dist. LEXIS 53185, at *5 (citing Facenda v. N.F.L. Films, Inc., 542 F.3d

1007, 1023 (3d Cir. 2008)). "When reviewing each motion, the court is bound to

view the evidence in the light most favorable to the nonmovant." Id. (citing FED.

R. CIV. P. 56; United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1980)

(Nealon, J.)).

"Where there is no material fact in dispute, the moving party need only

establish that it is entitled to judgment as a matter of law." Schwab v. Reamstown

Mut. Ins. Co., 2006 U.S. Dist. LEXIS 82815, at *3 (M.D. Pa. Nov. 14, 2006)

(Caputo, J.). However, "[i]f the 'non-moving party fails sufficiently to establish

the existence of an essential element of its case on which it bears the burden of

proof at trial, there is not a genuine dispute with respect to a material fact and thus

the moving party is entitled to judgment as a matter of law.'" Mancini v.

6

Northampton Cnty., 836 F.3d 308, 313-14 (3d Cir. 2016) (quoting Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 265 (3d Cir. 2014)).

## II.   STATEMENT OF FACTS

On or about September 7, 2007, Plaintiff obtained a "Care Credit" card which was used for personal, family, or household purposes (the "Account"). (Doc. 80, p. 2); (Doc. 84, p. 2); (Doc. 94, p. 4).  On November 15, 2010, Plaintiff made her last payment on the Account to GE Electric Capital Corporation and GE Money Bank (collectively "GE").  (Doc. 84, pp. 2-3); (Doc. 94, pp. 4-5).  At that time, Plaintiff had an outstanding balance on her Account.  See (Doc. 80, pp. 3-4); (Doc. 84, p. 5); (Doc. 91, p. 5).  On June 16, 2011, GE charged off the delinquency balance on Plaintiff's Account.  (Doc. 84, p. 3); (Doc. 94, p. 5).  On or about July 27, 2011, by agreement dated January 7, 2011, GE sold, transferred, and assigned certain charged-off receivables, including Plaintiff's Account, to Atlantic Credit and Finance Special Finance Unit III, LLC ("Atlantic").  (Id.).  On or about October 18, 2011, by agreement dated June 20, 2011, Atlantic sold, transferred, and assigned certain charged-off receivables, including Plaintiff's Account, to Security Credit Services, LLC ("Security Credit").  (Id.).  On or about January 30, 2012, Security Credit sold, transferred, and assigned certain charged-off receivables, including Plaintiff's Account, to Brightwater Capital, LLC

7

("Brightwater").  (Doc. 84, p. 3); (Doc. 94, p. 5).  By agreement dated January 30, 2013, Brightwater sold, transferred, and assigned certain charged-off receivables, which included Plaintiff's Account, to Crown.  (Doc. 80, p. 3); (Doc. 84, p. 3), (Doc. 94, pp. 5-6).

Crown is a purchaser of charged-off receivables.  (Doc. 80, p. 2); (Doc. 84, p. 2).  However, Crown does not directly collect on its charged-off receivables.  (Id.).  Rather, Crown refers all of its charged-off receivables to third-parties for collection.  (Id.).  For example, on December 18, 2012, Crown entered into a service agreement (the "Service Agreement") with Turning Point.  (Doc. 80, p. 5); (Doc. 84, p. 3).  According to the Service Agreement, Crown was seeking "to procure certain collection services from" Turning Point.  (Doc. 80-8, p. 2).  Additionally, as part of the Service Agreement, Turning Point agreed to the following provisions:

> 2.1 From time to time and in its sole and absolute discretion, Forwarder may refer to Agency certain Accounts that are in default.  Agency agrees to provide the Services described in the Agreement.  Except pursuant to Forwarder's express consent, obtained in advance and in writing, Services will be provided exclusively by Agency's employees and the referral of any Account by Agency to a third party, without Forwarder's prior written authorization, is expressly prohibited.  In the case of any referral approved by Forwarder, Forwarder will not be obligated to pay compensation in excess of the Fee due to Agency.  Forwarder retains the right, in its exclusive discretion,

to modify this Agreement at any time in regard to third party referral standards by providing written notice to Agency.  Upon receipt by Agency, any such modification will be deemed fully incorporated into the Agreement. . . .

4.1 <u>Performance Standards</u>. Agency shall perform such services as Agency, in its professional judgment, deems appropriate, subject to the terms of the [Service] Agreement and the laws and regulations governing the collections of such Accounts.  Agency shall maintain a complete, correct and current record of each Account, which Forwarder may access and review at any time.

4.2 <u>Due Diligence and Lawful Action</u>.  Agency agrees to use due diligence and to employ lawful means in its effort to collect on Accounts referred to Agency by Forwarder.  In providing services, Agency shall conform to a standard of practice and care that equals or exceeds the standard applicable to other Agencies, which provide similar services in the same state(s) as Agency.

4.3 <u>Settlements</u>. Forwarder grants Agency authority to settle any Account for an amount equal to or greater than the percentages of balances identified in the Settlement Guidelines. Agency will not settle or in any way compromise Accounts for less than the amounts indicated in the Settlement Guidelines unless Agency obtains prior written approval from the Company to settle any Account for a lesser amount. . . .

7.3 Forwarder, in its sole and exclusive discretion, may instruct Agency to close and return any Account at any time. . . .

8.1 <u>Compliance with Applicable Laws</u>.  Agency represents, warrants, and covenants that when performing its obligations under the [Service] Agreement, Agency shall comply with all applicable federal, state, and local laws, statutes, and

regulations, including but not limited to the federal Fair Debt Collection Practices Act, Truth in Lending Act, Fair Credit Reporting Act and Gramm-Leach Bliley Act, as amended. Further Agency, while pursuing its duties hereunder with diligence and vigor, shall at all times maintain and protect the good name and reputation of Forwarder. . . .

8.4 <u>Audits.</u>  (a) Forwarder, or persons retained by Forwarder, and federal and state regulatory agencies that supervise Forwarder shall have the right to examine and audit Agency's business, operations, security architecture, systems, procedures and practices that relate to the Services and the Agency's obligations under this Agreement.  Forwarder may, among other audit tasks, measure or evaluate Agency's performance and professionalism, verify the accounting of all funds, including any trust account, verify the accuracy and propriety of all commissions verify the timeliness of recording and remitting payments, verify the adequacy of cash controls, and verify Agency's overall compliance with this Agreement. Audits may be performed, either on-site or remotely, at Forwarder's discretion.  Agency shall grant Forwarder access to its system of record via electronic access to permit remote audits.  On-premises audits and inspections will be limited to one initial security audit and one annual audit thereafter. Additional on-premises audits may be conducted at Forwarder's sole discretion upon the occurrence of a Termination Event.  Forwarder may delegate the right to audit to any third party auditor or examiner.  On-premises audits and inspection shall be conducted at Agency's expense.  During Agency's normal business hours, Agency shall provide to the auditor a reasonable workspace and the use of on-site photocopying equipment, computer network, and telephones at no charge to Forwarder.  Agency shall allow full and free access to records relating to any Account forwarded and shall provide necessary technical assistance as required to access these records.  Forwarder agrees to advise Agency of the exceptions/discrepancies identified in any audit and agrees to

allow Agency a reasonable period of time to respond to them.
Where Forwarder determines Agency shall take corrective
measures, Agency shall submit to Forwarder a corrective action
plan that will correct any deficiencies. . . .

8.6 <u>Customer Service and Quality</u>. Agency agrees to forward a
copy of any written complaint received from an Accountholder
in regard to Agency's handling of an Account as well as the
response made or action taken by Agency. . . .

9.5 <u>Independent Contractor Status</u>. The [Service] Agreement
shall not be construed as creating an employee/employer
agency, partnership, or joint venture relationship between
Agency and Forwarded. Each party shall have the obligation to
supervise, manage, contract, direct, procure, perform or cause
to be performed, all work to be performed under the [Service]
Agreement and shall be liable for all acts or omissions of its
employees and agents in performing their respective
obligations hereunder.

(Doc. 80-8, pp. 4, 6-7, 10-11, 12); (Doc. 84, p. 4); (Doc. 86-3, pp. 5, 9, 10-11, 12).

On February 4, 2013, pursuant to the Service Agreement, Crown referred

Plaintiff's Account to Turning Point. (Doc. 80, p. 3); (Doc. 84, p. 5). On February

6, 2013, Turning Point issued a letter to Plaintiff, which stated, in relevant part,

that:

Our client, Crown Asset Management, LLC has purchased your
account and all rights to the debt from GE Sales Finance.
There is an outstanding balance due of $2,483.83. Our client's
records indicate that payment has not been received or
processed as of the date of this correspondence, and has
therefore been listed for collection.

11

> If you are unsure of its validity, you may contact us directly at
> 1-800-872-9312 to obtain additional information regarding this
> obligation.  Otherwise, you may clear your account from our
> collection process immediately by sending the bottom portion
> of this letter with your payment in full using the enclosed
> envelope.  Your account will be properly credited and you will
> receive no further communication from us on this account.

(Doc. 80, pp. 3-4); (Doc. 84, p. 5); (Doc. 91, p. 5).  That letter also contained the

following language:

> **This communication from a debt collector is an attempt to
> collect a debt and any information obtained will be used for
> that purpose.**
>
> Unless you, within thirty days after receipt of this notice,
> dispute the validity of this debt, or any portion thereof, this
> office will assume this debt is valid.  If you notify this office in
> writing within the thirty-day period that the debt, or any portion
> thereof, is disputed, our office will obtain verification of the
> debt or a copy of a judgment against you and a copy of such
> verification or judgment will be mailed to you by our office.
> Upon your written request within the thirty-day period, our
> office will provide you with the name and address of the
> original creditor, if different from the current creditor.

(Doc. 80-4, p. 2) (emphasis in original); (Doc. 91, p. 5).  In addition, at the head of

the letter, Turning Point self-identified as a "National Debt Collection Agency."

(Doc. 80-4, p. 2).

Subsequent to Crown's referral of Plaintiff's Account to Turning Point,

Turning Point left two (2) voicemail messages for Plaintiff on her cellular

telephone. (Doc. 84, p. 5); (Doc. 94, p. 9). The transcript of the first voicemail

message left by Turning Point reads as follows:

> Hi, this message is intended for Mary. Mary, my name is Brian
> calling from Turning Point. I'm calling in regards to a matter
> of yours that's been placed here in the office. It's very
> important that you return my call. You could reach me at 800-
> 872-9312. Your file number is 881811. Again, this is Brian
> calling from Turning Point, and it's important that I hear back
> from you.

(Doc. 84, pp. 5-6); (Doc. 94, p. 9). The transcript of the second voicemail from

Turning Point reads as follows:

> Hi, this message is intended for Mary Barbato. Mary, my name
> is Brian. I'm calling from Turning Point. And I'm calling in
> regards to a matter of yours that's been placed here in the
> office. It's very important that you return my call. You could
> reach me at 800-872-9312. Your file number is 881811.
> Again, this is Brian calling from Turning Point. It's important
> that I hear back from you. Thank you.

(Doc. 84, p. 6); (Doc. 94, pp. 9-10).

At all times relevant to the above-captioned action, Crown did not issue any

letters or place calls to Plaintiff regarding her Account. (Doc. 84, p. 5); (Doc. 94,

p. 8). Moreover, during that same period, Crown did not leave any voicemail

messages on Plaintiff's telephone concerning her Account. (Id.). Additionally,

prior to its issuance, Crown neither reviewed nor approved the February 6, 2013

letter. (Doc. 84, p. 5); (Doc. 94, pp. 8-9).

On or about May 31, 2013, Plaintiff filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Middle District of Pennsylvania. (Doc. 84, p. 6); (Doc. 94, p. 10). On June 5, 2013, Crown recalled Plaintiff's Account from Turning Point as a result of Plaintiff's bankruptcy filing. (Id.). On June 6, 2013, Crown closed Plaintiff's Account. (Id.).

## III. DISCUSSION

### A. FDCPA

As stated, Plaintiff brings her claims under sections 1692e(11) and 1692g of the FDCPA. (Doc. 21, pp. 4-5). "The FDCPA is intended to combat 'the use of abusive, deceptive, and unfair debt collection practices by . . . debt collectors.'" McDermott v. Nationstar Mortg., LLC, 2015 U.S. Dist. LEXIS 154310, at *13 (E.D. Pa. Nov. 13, 2015) (quoting 15 U.S.C. § 1692(a)). The United States Court of Appeals for the Third Circuit has stated that:

> To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a "debt" as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt.

Douglass v. Convergent Outsourcing, 765 F.3d 299, 303 (3d Cir. 2014).

Crown claims it is entitled to summary judgment because "Plaintiff cannot prove Crown was a debt collector under the FDCPA, and imposition of vicarious

liability would be contrary to the facts of the case and sound public policy." (Doc. 83, p. 1). Plaintiff contends she is entitled to summary judgment because she was a "consumer," Crown and Turning Point were "debt collectors," and Turning Point violated sections 1692e(11) and 1692g of the FDCPA in an attempt to collect a "debt." (Doc. 79, pp. 12-24). Moreover, Plaintiff argues that Crown should be vicariously liable "for Turning Point's violations of the FDCPA" because "[w]here one debt collector retains a second debt collector to collect a consumer account, the former is responsible for the FDCPA violations of the latter." (Id. at p. 23) (citing Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 405 (3d Cir. 2000); Janetos v. Fulton, Friedman & Gullace, LLP, 825 F.3d 317 (7th Cir. Apr. 7, 2016); Fox v. Citicorp Credit Servs., Inc., 15 F.3d 1507, 1516 (9th Cir. 1994)).

Based upon the above-described motions for summary judgment, the parties place the following at issue: (1) whether Crown and Turning Point were "debt collectors" under the FDCPA at the time the alleged violations occurred; (2) whether Crown is liable for the alleged collection activities of Turning Point; and (3) whether Turning Point violated sections 1692e(11) and 1692g of the FDCPA. (Docs. 77-80, 83-84). As discussed in more detail below, the Court need only address the first two (2) issues to dispose of the motions for summary judgment at bar.

15

B.    Crown's Status Under the FDCPA

Plaintiff argues that, "at all relevant times, [Crown] was [] a 'debt collector' as defined by the FDCPA." (Doc. 79, p. 13). According to Plaintiff, "[t]he assignee of defaulted obligations may be considered a debt collector." (Id.) (citing Pollice, 225 F.3d at 403). Plaintiff states that "[i]f the principal purpose of the assignee's business is the collection of defaulted obligations, then the assignee is deemed a debt collector, even if the assignee retains third party debt collectors to collect the debts." (Id.) (emphasis in original) (citing Pollice, 225 F.3d at 403). Plaintiff claims that Crown "is primarily engaged in the business of purchasing consumer accounts in default and collecting the debts using third party debt collection agencies." (Id. at p. 15).

Crown contends that it is entitled to summary judgment, and, thus, Plaintiff's motion should be denied, because, inter alia, it is not a "debt collector" under the FDCPA. (Doc. 83, pp. 6-11); (Doc. 90, pp. 5-11); (Doc. 96, pp. 2-5). In particular, Crown argues that it does not meet the definition of "debt collector" "simply because it took an assignment of the Account while the debt was in default." (Doc. 83, p. 9). Rather, according to Crown, Plaintiff must also show that Crown meets the statutory definition of "debt collector" found in section 1692a(6) of the FDCPA. (Id.).

16

However, Crown contends, Plaintiff cannot show that Crown meets the definition of "debt collector" for a number of reasons. (Doc. 83, p. 9). "First," Defendant states that "Jessica Foster, vice president of operations," testified during a deposition that "Crown's principal business purpose is the purchase of charged-off receivables." (Id. at p. 10). "Second," according to Crown, it "engages in no collection activities on these receivables for itself" and "does not collect debts owed to another." (Id.). "Third, Crown does not collect on its own debts and does not use a name other than its own as if it were a debt collector." (Id.). Additionally, Crown argues that "Turning Point was solely responsible for all collection actions on Plaintiff's Account pursuant to the terms of the service agreement with Crown." See (Id. at pp. 12-14); (Doc. 90, pp. 5-11); (Doc. 96, pp. 2-5).

As stated, to obtain relief under the FDCPA, Plaintiff must establish, among other things, that Crown was a "debt collector." See Douglass, 765 F.3d at 303. Notably, "the FDCPA draws a distinction between 'debt collectors,' who are covered by the statute, and 'creditors,' who are not." McDermott, 2015 U.S. Dist. LEXIS 154310, at *13 (citing 15 U.S.C. § 1692a(6)). The FDCPA defines "debt collector" as "'any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any

17

debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.'" McDermott, 2015 U.S. Dist. LEXIS 154310, at *13 (quoting 15 U.S.C. § 1692a(6)). "A 'creditor,'" on the other hand, "is broadly defined [by the FDCPA] as one who 'offers or extends credit creating a debt or to whom a debt is owed,' 15 U.S.C. § 1692a(4), and a creditor is generally considered to be restrained from abusive collection practices 'by the desire to protect [its] good will when collecting past due accounts . . . ." Id. (internal citation omitted).

The United States Court of Appeals for the Third Circuit has stated "[a]s to a specific debt, one cannot be both a 'creditor' and a 'debt collector,' as defined in the FDCPA, because those terms are mutually exclusive." Fed. Trade Comm'n v. Check Investors, Inc., 502 F.3d 159, 173 (3d Cir. 2007). While a defendant in an FDCPA action cannot be both a "creditor" and a "debt collector," the United States Court of Appeals for the Seventh Circuit has noted that "for debts that do not originate with the one attempting collection, but are acquired from another, the collection activity related to that debt could logically fall into either category." Schlosser v. Fairbanks Capital Corp., 323 F.3d 534, 536 (7th Cir. 2003).

For example, here, it is undisputed that Crown acquired Plaintiff's Account and, thus, is actually the entity to whom the Account is owed. (Doc. 80, p. 3);

18

(Doc. 91, p. 3). Therefore, at least nominally, Crown could be considered a "creditor" under the FDCPA. <u>See</u> 15 U.S.C. § 1692a(4). However, in such situations, the Third Circuit has looked to the status of the "debt" in question at the time it was acquired to determine whether the defendant was acting as a "creditor" or "debt collector" under the FDCPA.

    In particular, the Third Circuit has determined that "[o]ne attempting to collect a debt is a 'debt collector' under the FDCPA if the debt in question was in default when acquired." <u>Check Investors</u>, 502 F.3d at 173; <u>see</u> <u>Beard v. Ocwen Loan Servicing, LLC</u>, 2016 U.S. Dist. LEXIS 9945, at *2-3 (M.D. Pa. Jan. 28, 2016) (Caldwell, J.) ("Under prevailing law, however, if an ordinarily-exempt entity acquires a debt obligation after the debt was in default, the entity may be deemed a debt collector.") (citing <u>Pollice</u>, 225 F.3d at 403). "Admittedly," the Third Circuit stated in <u>Check Investors</u>, "focusing on the status of the debt when it was acquired overlooks the fact that the person engaging in the collection activity may actually be owed the debt and is, therefore, at least nominally a creditor." <u>Check Investors</u>, 502 F.3d at 173. "Nevertheless, pursuant to § 1692a, Congress has unambiguously directed our focus to the time the debt was acquired in determining whether one is acting as a creditor or debt collector under the FDCPA." <u>Id.</u> Also, "[f]or this rule to apply, the entity must have acquired the

defaulted debt by assignment, not merger." <u>Beard</u>, 2016 U.S. Dist. LEXIS 9945, at *3 (citing <u>Pollice</u>, 225 F.3d at 403).

Notably, "[t]he term 'default' is not defined in the FDCPA." <u>Hoehn v. FCC Fin., LLC</u>, 126 F. Supp. 3d 472, 475 (D.N.J. 2015).  In determining whether a "debt" is considered in "default," courts have taken a number of approaches and analyzed the issue on "'case by case basis.'" <u>Cleary v. Hertz Rent-A-Car</u>, 2013 U.S. Dist. LEXIS 106726, at *4-5 (E.D. Pa. July 29, 2013) (quoting <u>Alamo v. ABC Fin. Servs., Inc.</u>, 2011 U.S. Dist. LEXIS 5392, at *5 (E.D. Pa. Jan. 20, 2011) ("The FDCPA does not define the term 'default.' This omission apparently is a deliberate decision, leaving it to a court to decide what constitutes a default on a case-by-case basis.")).

One approach was discussed by the United States District Court for the Eastern District of Pennsylvania, which stated that "[b]ecause the FDCPA does not provide a definition of 'default,' some courts within the Third Circuit have looked to the statutory provisions governing, and contractual provisions between, creditors and debtors to determine whether a debt is in default at any given time." <u>Haber v. Bank of Am., N.A.</u>, 2014 U.S. Dist. LEXIS 87614, at *48 (E.D. Pa. June 27, 2014) (citing <u>Prince v. NCO Fin. Servs., Inc.</u>, 346 F. Supp. 2d 744, 748 (E.D. Pa. 2004)).  However, the District Court noted, "other courts have stated that, in

view of the FDCPA's purpose of 'eliminat[ing] abusive debt collection practices

by debt collectors,' 15 U.S.C. § 1692(e), this standard is sometimes too lenient

towards the potential debt collector." Haber, 2014 U.S. Dist. LEXIS 87614, at

*48 (citing Magee v. AllianceOne, Ltd., 487 F. Supp. 2d 1024, 1027-28 (S.D. Ind.

2007)).  In reaching its decision, the District Court in Haber determined that "the

relevant question in this case is whether [the defendants], not the [plaintiffs],

classified the debt as in 'default' at the relevant time." Id. (citing Prince, 346 F.

Supp. 2d at 748; Roberts v. NRA Grp., LLC, 2012 U.S. Dist. LEXIS 113021, at

*17 (M.D. Pa. Aug. 10, 2012) (Caputo, J.)).  The District Court noted in a footnote

that:

> [i]n general, a better view, given the FDCPA's purposes, would
> be to consider the debt in 'default' at the time it was acquired if
> it could be said to have been in default under either (a) a
> subjective view, because either the transferee of the transferor
> of the debt believed it was in default at the time of acquisition
> (following from Prince), or (b) an objective view.

Id. at *49 n.16 (citing Check Investors, Inc., 502 F.3d at 172 n.12).

Other courts have looked to the parties' definition of "default."  In

particular, these courts "use the definition [of 'default'] contained in the applicable

contract or agreement to determine when the debt is in default." Hoehn, 126 F.

Supp. 3d at 474 (citing Hartman v. Meridian Fin. Servs., Inc., 191 F. Supp. 2d

21

1031, 1044 (W.D. Wis. 2002); <u>Prince</u>, 346 F. Supp. 2d at 748; <u>Alamo</u>, 2011 U.S.

Dist. LEXIS 5392, at *12; <u>Kapsis v. Am. Home Mortg. Servicing, Inc.</u>, 923 F.

Supp. 2d 430, 440-43 (E.D.N.Y. 2013)).

Some courts, however, have declined "to accept the contract definition of

'default' to determine if an entity is subject to the FDCPA." <u>Hoehn</u>, 126 F. Supp.

3d at 474.  Specifically, "in <u>McGee v. AllianceOne, Ltd.</u>, 487 F. Supp. 2d 1024

(S.D. Ind. 2007), the court found it was improper to 'leave[] it to the discretion of

the creditor whether to declare default; by looking at the definition of default in

the defendant's contract." <u>Id.</u> at 474-75 (quoting <u>McGee</u>, 487 F. Supp. 2d at

1026).  Evidencing a third approach, the court in <u>McGee</u>:

> considered the dictionary definition of "default" and
> determined that a debt collector is an entity which contacts a
> consumer "specifically because a debtor has missed a payment,
> and the creditor believes the debtor is more likely to bring her
> account current if she is contacted by a third-party debt
> collector than if she receives a routine bill from the creditor."

<u>Id.</u> at 475 (quoting <u>McGee</u>, 487 F. Supp. 2d at 1028); <u>see</u> <u>Check Investors</u>, 502

F.3d at 172 n.12 (defined "default" as "'the omission or failure to perform a legal

or contractual duty; esp., the failure to pay a debt when due.'") (quoting Black's

Law Dictionary 449 (8th ed. 2004)).

Here, it is undisputed that the Account it was in "default" when it was

acquired by Crown.  See (Doc. 83, p. 9) ("Crown argues it is not a debt collector simply because it took an assignment of the Account while the debt was in default."); (Doc. 84, pp. 2-3); (Doc. 90, p. 10); (Doc. 94, pp. 4-5).  In particular, it is undisputed that Crown purchases "charged off receivables," (Doc. 91, p. 2), which are consumer or commercial accounts where "[t]he consumer stopped paying on them." (Doc. 80-3, p. 3).  Further, there is no dispute that Plaintiff's last payment on the Account was made on November 15, 2010.  (Doc. 84, p. 2); (Doc. 94, p. 4).  Also undisputed is the fact that, by agreement dated January 30, 2013, over two (2) years after Plaintiff's last payment on the Account, Crown acquired Plaintiff's Account.  (Doc. 84, pp. 2-3); (Doc. 94, p. 5).  Finally, the Service Agreement states that Crown "may refer to [Turning Point] certain Accounts that are in default." (Doc. 86-3, p. 3).  Therefore, the Court need not decide which approach to apply in order to determine whether the Account was in "default" when it was acquired by Crown because, as stated, it is undisputed that the Account was in "default" at the time Crown acquired it by agreement dated January 30, 2013.  See (Doc. 83, p. 9); (Doc. 84, pp. 2-3); (Doc. 90, p. 10); (Doc. 94, pp. 4-5).

As discussed above, the United States Court of Appeals for the Third Circuit has held:

23

> that one attempting to collect a debt is a "debt collector" under
> the FDCPA if the debt in question was in default when
> acquired.  Conversely, [the Third Circuit] concluded that §
> 1692a means that an entity is a creditor if the debt it is
> attempting to collect was not in default when it was acquired.

Check Investors, 502 F.3d at 173 (citing Pollice, 225 F.3d at 403-04).  Thus, the

status of Plaintiff's Account at the time Crown acquired it by agreement dated

January 30, 2013, guides the determination regarding Crown's status under the

FDCPA.

Under the present circumstances, since the undisputed facts establish that

Account was in "default" when Crown acquired it on January 30, 2013, the Court

agrees with Plaintiff that Crown was acting as "debt collector" and, thus, subject

to liability under the FDCPA.  See Evankavitch v. Green Tree Serv., LLC, 793

F.3d 355, 358 n.2 (3d Cir. 2015) (citing Pollice, 225 F.3d at 403); Pollice, 225

F.3d at 403; Beard v. Ocwen Loan Serv., LLC, 2015 U.S. Dist. LEXIS 128401, at

*8 n.1 (M.D. Pa. Sept. 24, 2015) (Caldwell, J.) (citing Pollice, 225 F.3d at 403;

Oppong v. First Union Mort. Corp., 215 F. App'x 114 (3d Cir. 2007)).  However,

Defendant is correct that the mere conclusion that Crown was assigned the

Account when it was in "default" does not end the inquiry.  Rather, "the Third

Circuit has held that an entity is a debt collector if (1) it is assigned a defaulted

debt, and (2) its principal business purpose is the collection of debts, or it regularly

engages in debt collection." Beard, 2015 U.S. Dist. LEXIS 128401, at *8 n.1

(emphasis added) (citing Pollice, 225 F.3d at 403; Oppong, 215 F. App'x 114).

      In addition to arguing that Crown acquired the Account when it was in

"default," Plaintiff also argues that Crown's "principal purpose" is the collection

of "any debts." (Doc. 79, pp. 14-15). The summary judgment record supports

Plaintiff's position. Specifically, it is undisputed that Crown purchases "charged-

off receivables," (Doc. 84, p. 2); (Doc. 94, p. 2), which, as noted above, are

defaulted accounts where the consumer has stopped paying on the debt. See (Doc.

80-3, p. 3). According to Jessica Foster, Crown's Federal Rule of Civil Procedure

30(b)(6) representative, Crown is "a debt purchaser." (Doc. 83, p. 10); (Doc. 86,

p. 5). While Crown claims that it "does not collect on charged-off receivables," it

does not dispute that it "refers all charged-off receivables to third-party,

independent servicers" for collection. (Doc. 84, p. 2); see also (Doc. 80, p. 2);

(Doc. 91, p. 2); (Doc. 94, pp. 2-3). As a result, there is no dispute that Crown's

principal purpose is to acquire accounts in "default" for the purpose of collection.

See (Doc. 80, p. 2); (Doc. 84, p. 2); see also (Docs. 94-1 - 94-3). Further,

approximately ninety (90) to ninety-five (95) percent of Crown's receivables

concern consumers. (Doc. 86, p. 12). Therefore, it is determined that Crown's

"principal purpose" is the collection of "debts" and, thus, meets the definition of a

"debt collector" under section 1692a(6) the FDCPA.  See Pollice, 225 F.3d at 404, 405 n.28; see also Oppong, 215 F. App'x at 118-20; Martsolf v. JBC Legal Grp., P.C., 2008 U.S. Dist. LEXIS 6876, at *42-45 (M.D. Pa. Jan. 30, 2008) (Conner, J.).

As a result of the foregoing, to the extent Crown argues it is entitled to summary judgment because it is not a "debt collector" under the FDCPA, see (Doc. 83, pp. 5-11), it's motion for summary judgment will be denied because, as stated, Crown meets the definition of a "debt collector" under the FDCPA. Therefore, as discussed in more detail below, the Court must next consider Plaintiff's argument that Turning Point meets the definition of a "debt collector" under the FDCPA, (Doc. 79, pp. 13-15), and the portion of Defendant's motion for summary judgment contending that it cannot be held vicariously liable for the collection activities of Turning Point, (Doc. 83, pp. 12-14).

C.    Turning Point's Status Under the FDCPA

As part of her motion for summary judgement, in addition to claiming that Crown was a "debt collector," Plaintiff also argues that Turning Point qualifies as a "debt collector" under the FDCPA. (Doc. 79, pp. 13-15). Consequently, Plaintiff claims that Crown should be held vicariously liable for the alleged debt collection activity of Turning Point. See (Id. at pp. 13-15, 23-24). Crown, on the

other hand, claims that, if the Court determines it is a "debt collector under the FDCPA, Plaintiff's motion should be denied because it should not be held vicariously liable for Turning Point's alleged collection activity.[1] (Doc. 83, pp. 12-14). The issue of vicarious liability will be addressed first.

In support of their respective arguments concerning vicarious liability, the parties point to the Service Agreement, but reach differing conclusions. (Id. at pp. 15-17); (Doc. 95, pp. 9-11). Specifically, Crown argues that the Service Agreement "did not create an agency relationship" between Crown and Turning Point. (Doc. 83, p. 16). "Rather," Crown contends, "Turning Point had an obligation to 'supervise, manage, contract, direct, procure, perform or cause to be performed' its own work in collection of Plaintiff's account and to comply with all 'applicable federal, state, and local laws, statutes, and regulations.'" (Id.). As a result, Crown argues that it should not be held vicariously liable for Turning Point's collection efforts. (Id.). Plaintiff, on the other hand, argues that Crown's

---

[1] While Crown states that "it appears Turning Point satisfies the definition of a debt collector under the FDCPA," (Doc. 83, p. 14) (emphasis added); (Doc. 90, p. 15), it also notes that it "cannot verify the principal business purpose of Turning Point." See (Doc. 91, p. 3). Based on these statements, it is determined that Crown does not stipulate to Plaintiff's assertion that Turning Point's "principal business was collecting debts." (Doc. 79, p. 14); (Doc. 80, p. 3). Rather, as discussed in more detail below, at this stage in the litigation, there is a question as to whether Turning Point was a "debt collector" under the FDCPA. Moreover, even if Turning Point's status under the FDCPA was undisputed, the Court would still be required by the Federal Rules to determine whether Plaintiff has established her entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(e)(3).

engagement of Turning Point to collect on the Account, by way of the Service Agreement, requires the imposition of vicarious liability here due to Third Circuit precedent.  (Doc. 95, p. 11).

It is undisputed that Crown entered into a Service Agreement with Turning Point on December 18, 2012.[2]  See (Doc. 80, p. 5); (Doc. 84, p. 3); (Doc. 91, p. 7); (Doc. 94, p. 6).  Further, as noted, the parties do not dispute the contents of the Service Agreement.  See (Id.).  Pursuant to the Service Agreement, Turning Point agreed to provide collection services to Crown and "undertake collection on each [a]ccount placed by" Crown.  (Doc. 86-3, p. 1).  Also undisputed is that on February 4, 2013, pursuant to the Service Agreement, Crown referred Plaintiff's Account to Turning Point for collection.  (Doc. 80, p. 3); (Doc. 84, p. 5).

The Court notes that:

> [a]s recognized in the Pollice case, while there is relatively little case law on the subject of vicarious liability under the FDCPA, there are cases supporting the notion that an entity which itself meets the definition of 'debt collector' may be held vicariously liable for unlawful collection activities carried out by another on its behalf.

Gary v. Goldman & Co., 180 F. Supp. 2d 668, 673 (E.D. Pa. Jan. 14, 2002) (citing

---

[2] While the parties agree that Crown entered into the Service Agreement with Turning Point, see (Doc. 80, p. 5); (Doc. 84, p. 3); (Doc. 91, p. 7); (Doc. 94, p. 6), the Court notes that the record establishes that the Service Agreement was actually entered into between Crown Asset Management 1, LLC ("CAM 1") and Turning Point.  See (Doc. 86, pp. 19-20); (Doc. 86-3).

Pollice, 225 F.3d at 404); see Marucci v. Cawley & Bergmann, LLP, 66 F. Supp.

3d 559, 563 (D.N.J. 2014) ("'The Third Circuit has observed that, although not

many cases specifically address vicarious liability under the FDCPA, there are

several 'supporting the notion that an entity which itself meets the definition of

"debt collector" may be held vicariously liable for unlawful collection activities

carried out by another on its behalf.'") (quoting Pollice, 225 F.3d at 404).  "'The

rule to be gleaned from' the FDCPA vicarious liability cases" within the Third

Circuit is that:

> Federal courts that have considered the issue have held that the
> client of an attorney who is a 'debt collector,' as defined in §
> 1692a(6), is vicariously liable for the attorney's misconduct if
> the client is itself a debt collector as defined in the statute.
> Thus, vicarious liability under the FDCPA will be imposed for
> an attorney's violations of the FDCPA if both the attorney and
> the client are debt collectors as defined in § 1692a(6).

Marucci, 66 F. Supp. 3d at 563 (quoting Pollice, 225 F.3d at 404-05).

Importantly, however, the Third Circuit "did not confine its reasoning to the

attorney-client relationship, however; its holding rested on the statute and more

general conceptions of vicarious liability for the acts of an agent." Id.  "Thus, '[an

entity]–which itself meets the definition of "debt collector"–may be held

vicariously liable for [its hired collector's] collection activity.'" Id. (quoting

Pollice, 225 F.3d at 405); see Martsolf, 2008 U.S. Dist. LEXIS 6876, at *42 ("An

29

entity that owns a debt may be liable for FDCPA violations of a debt collector it

engages to collect the obligation provided that the owner of the debt is itself a debt

collector.") (citing <u>Pollice</u>, 225 F.3d at 404); <u>Hutt v. Albert Einstein Med. Ctr.</u>,

2005 U.S. Dist. LEXIS 21548, at *23 n.7 (E.D. Pa. 2005) ("a creditor that is not

itself a debt collectors is not vicariously liable for the actions of a debt collector in

the creditor's employ.").

   Notably, however, "statutory torts are to be interpreted in accordance with

traditional tort principles of liability." <u>Marucci</u>, 66 F. Supp. 3d at 564.  "In <u>Meyer</u>

<u>v. Holley</u>, 537 U.S. 280 [] (2003), the Supreme Court discussed vicarious liability

under the Fair Housing Act." <u>Id.</u>  "The Court held [in <u>Meyer</u>] that 'when Congress

creates a tort action, it legislates against a legal background of ordinary tort-

related vicarious liability rules and consequently intends its legislation to

incorporate those rules.'" <u>Id.</u> (quoting <u>Meyer</u>, 537 U.S. at 285).  "Surveying such

common law principles, the Court found that they 'ordinarily make principals or

employers vicariously liable for acts of their agents or employees in the scope of

their authority or employment.'" <u>Id.</u> (quoting <u>Meyer</u>, 537 U.S. at 285).  "Such a

principal/agent relationship requires (1) that there be control, or 'the right to direct

or control'; and (2) that the parties consent to one's acting on behalf of the other."

<u>Id.</u> (quoting <u>Meyer</u>, 537 U.S. at 285).

"The Supreme Court's general approach in Meyer and the Third Circuit's specific holding in Pollice point the same way." Marucci, 66 F. Supp. 3d at 564. Specifically, "[a] debt collector is responsible for 'the activities of those it enlists to collect debts on its behalf." Id. (quoting Pollice, 225 F.3d at 405). "The Pollice Court found this to be 'a fair result because an entity that is itself a "debt collector"–and hence subject to the FDCPA–should bear the burden of monitoring the activities of those it enlists to collect debts on its behalf.'" Id. at 563 (quoting Pollice, 225 F.3d at 405); see Palmer v. Dynamic Recovery Solutions, LLC, 2016 U.S. Dist. LEXIS 59229, at *18 (M.D. Fla. May 4, 2016) (In rejecting a debt collector's argument that vicarious liability should not be imposed because the debt collector it hired was an independent contractor "which collects debts for [the debt collector principal] without [its] input or direction," the District Court found that "there is no doubt that a principal exercises the requisite level of control when it is itself a debt collector . . . . This approach makes sense, as the entire purpose of the FDCPA would be defeated if debt collectors were permitted to insulate themselves from liability by farming out their collection efforts to smaller debt collectors who face only nominal monetary judgments due to the FDCPA's net worth caps[footnote omitted] . . . . By virtue of its status as a debt collector, Cascade therefore exercises the requisite control over Dynamic to impose

31

vicarious liability for Dynamic's violation of the statute."); see also Marucci, 66 F. Supp. 3d at 564 (Noting that a debt collector is responsible for 'the activities of those it enlists to collect debts on its behalf and, thus, declined "to impose additional requirement that, to state a claim of vicarious liability under the FDCPA, [the plaintiffs'] must allege specific acts of control . . . .").

Thus, under the present circumstances, Crown, a "debt collector," should bear the burden of monitoring the collection activities of those it enlists to perform collection activity on its behalf and be responsible for "the activities of those it enlists to collect debts on its behalf." Pollice, 225 F.3d at 405; see Janetos, 825 F.3d at 325 ("A debt collector should not be able to avoid liability for unlawful debt collection practices simply by contracting with another company to do what the law does not allow it to do itself."). As established by the summary judgment record, Turning Point was an entity that Crown, a "debt collector," enlisted by way of the Service Agreement to collect on the Account. See (Doc. 86-3). Applying Pollice, the undisputed evidence is sufficient to establish that Crown could be subject to vicarious liability for the violations of the FDCPA allegedly committed by Turning Point in this matter. See Pollice, 225 F.3d 405; Marucci, 66 F. Supp. 3d at 564 (citing Meyer, 537 U.S. 280); see also Janetos, 825 F.3d at 325; Palmer, 2016 U.S. Dist. LEXIS 59229, at *18; Cox v. Hilco Receivables, L.L.C., 726 F.

32

Supp. 2d 659, 667-68 (N.D. Tex. Nov. 24, 2010).  As a result, Crown's argument that it is entitled to summary judgment because it cannot be held vicariously liable for the collection activities of Turning Point relevant to this case, (Doc. 83, pp. 12-14), is without merit and, thus, its motion for summary judgment will be denied. However, this conclusion does not end the inquiry, because, as stated, in order to successfully impose vicarious liability on Crown, a "debt collector," Plaintiff must show that, under the present circumstances, Turning Point also was a "debt collector" under the FDCPA.

Plaintiff argues that Turning Point was a "debt collector" under the FDCPA "because its principal business was collecting debts." (Doc. 79, p. 14) (citing Doc. 80, p. 3).  Plaintiff supports this contention by asserting that "[a]t the top of the letter at issue, Turning Point identifies itself as a 'National Debt Collection Agency.'" (Id.).  Additionally, Plaintiff points to the "Service Agreement between [Crown] and Turning Point" which "states that Turning Point 'seeks to provide certain collection services' to [Crown], that [Crown] 'seeks to procure certain collection services from' Turning Point, and that Turning Point 'will undertake collection on each [a]ccount placed' by [Crown]." (Id.).  Lastly, Plaintiff asserts that "as evidenced by the letter and voice messages at issue here, Turning Point used instrumentalities of interests commerce such as telephone or the mails in

33

furtherance of the principal purpose of its business, namely the collection of debts." (Doc. 79, p. 14).  However, under the present circumstances, Plaintiff's argument that the undisputed facts establish, as a matter of law, that Turning Point meets the definition of "debt collector" under the FDCPA lacks merit.

As noted, a "debt collector" pursuant to the FDCPA is:

> any person who uses any instrumentality of interstate
> commerce or the mails in any business the principal purpose of
> which is the collection of any debts, or who regularly collects
> or attempts to collect, directly or indirectly, debts owed or due
> or asserted to be owed or due another.

15 U.S.C. § 1692a(6).  Consequently, a party may be subject to the FDCPA if its "principal purpose . . . is the collection of any debts" or if they "regularly collect[] or attempt[] to collect, directly or indirectly, debts . . . ." Id.  Notably, "[w]hether a defendant is a 'debt collector' as defined by the FDCPA is a question of law appropriate for resolution on summary judgment." Prince, 346 F. Supp. 2d at 747 (citing Pollice, 225 F.3d at 403); see Duraney v. Washington Mut. Bank F.A., 2008 U.S. Dist. LEXIS 72087, at *34 (W.D. Pa. Sept. 11, 2008) (citing Pollice, 225 F.3d at 403).

As for what constitutes an entity that "regularly collects or attempts to collect" debts due another, it should be noted that the:

> FDCPA does not define the term 'regularly' or offer factors to

> consider in determining whether a defendant's debt collection
> practices fall within its provisions, a considerable amount of
> law has developed that addresses the proper interpretation of
> 'regularly' under the FDCPA.

Silva v. Mid-Atl. Mgmt. Corp., 277 F. Supp. 2d 460, 464 (E.D. Pa. 2003) (citing

Schroyer v. Frankel, 197 F.3d 1170 (6th Cir. 1999); Garrett v. Derbes, 110 F.3d

317 (5th Cir. 1997); Fox v. Citicorp Credit Servs., 15 F.3d 1507 (9th Cir. 1994);

Scott v. Jones, 964 F.2d 314 (4th Cir. 1992); 173 A.L.R. Fed. 223 (2001)).

However, the United States District Court for the District of New Jersey has noted

that "[c]ourts have debated what constitutes 'regularity' under the FDCPA, and

have set forth two different frameworks."[3] Coles v. Zucker Goldberg &

Ackerman, 2015 U.S. Dist. LEXIS 98628, at *17 (D.N.J. July 29, 2015).  First,

"[t]he 'aggregate' framework examines 'the amount of debt collection performed

in the aggregate,' and 'establishe[s] threshold percentages of how much debt

collection activity qualifies as "regular" and how little does not.'" Id. (quoting

Oppong v. First Union Mortg. Corp., 407 F. Supp. 2d 658, 664 (E.D. Pa. 2005)).

---

[3] While there are at-least two (2) approaches to determine "regularity" under the FDCPA, the Court need not determine which of the two (2) approaches discussed above, or any other, applies here because, as discussed in more detail below, Plaintiff does not argue in support of its motion for summary judgment that Turning Point was a "debt collector" under the FDCPA because it regularly collected or attempted to collect debts due another. (Doc. 79, p. 14).  Rather, Plaintiff argues that Turning Point was a debt collector because its "principal business was collecting debts." (Id.).  Therefore, the Court will not address whether Turning Point was a "debt collector" using "regularity" because it was not a ground upon which Plaintiff relied in her motion for summary judgment. (Id.).

"On the other hand, the 'frequency' approach focuses on the regularity of the defendant's debt collection, regardless of its relation to the defendant's other business activities." Coles, 2015 U.S. Dist. LEXIS 98628, at *17-18 (citing Oppong, 407 F. Supp. 2d at 662). "Indeed, while the Third Circuit has not explicitly adopted a particular approach, it has cited approvingly cases from the Ninth and Second Circuits, which have adopted the 'frequency' approach." Id. (citing Oppong, 215 F. App'x at 119 (citing Romine v. Diversified Collection Servs., Inc., 155 F.3d 1142, 1146 (9th Cir. 1998); Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll, & Bertolotti, 374 F.3d 56, 62-63 (2d Cir. 2008))). "A determination under the frequency approach is a 'fact intensive inquiry.'" Id. (quoting Greaves v. Ann Davis Assocs., Inc., 2015 U.S. Dist. LEXIS 18528, at *9 (D.N.J. Feb. 17, 2015)). Quoting the Second Circuit, the United States District Court for the District of New Jersey noted that:

> There are a number of factors that a plaintiff may allege to sufficiently plead the regularity requirement: "(1) the absolute number of debt collection communications issued, and/or collection-related litigation matters pursued, over the relevant period(s), (2) the frequency of such communications and/or litigation activity, including whether any patterns of such activity are discernable, (3) whether the entity has personnel specifically assigned to work on debt collection activity, (4) whether the entity has systems or contractors in place to facilitate such activity, and (5) whether the activity is undertaken in connection with ongoing client relationships

> with entities that have retained the lawyer or firm to assist in
> the collection of outstanding consumer debt obligations.”

<u>Coles</u>, 2015 U.S. Dist. LEXIS 98628, at \*18 (quoting <u>Goldstein</u>, 374 F.3d at 62;

citing <u>Greaves</u>, 2015 U.S. Dist. LEXIS 18528, at \*9-10).

In <u>Greaves v. Ann Davis Assocs., Inc.</u>, the United States District Court for

the District of New Jersey noted that “[i]n <u>Crossley v. Lieberman</u>, 868 F.2d 566,

569 (3d Cir. 1989), the Third Circuit quoted from a law review article which stated

that ‘any attorney who engages in collection activities more than a handful of

times per year must comply with the FDCPA.’” <u>Greaves</u>, 2015 U.S. Dist. LEXIS

18528, at \*9 (quoting <u>Crossley</u>, 868 F.2d at 569). “Thus,” the District Court

concluded, “the term ‘regularly’ excludes one instance, and likely excludes more

than one instance depending on the context.” <u>Id.</u>

Alternatively, as noted, an entity may be found to be a “debt collector”

under the FDCPA if its “principal purpose” is “the collection of any debts . . . .”

15 U.S.C. § 1692a(6).  In <u>Oppong v. First Union Mortgage Corporation</u>, the

United States Court of Appeals for the Third Circuit addressed, <u>inter alia</u>, whether

the District Court correctly determined that the defendant was a debt collector

under the FDCPA.  <u>Oppong</u>, 215 F. App’x at 118.  Ultimately, the Third Circuit

affirmed the District Court’s finding that the defendant was a “debt collector”

under the FDCPA because the defendant "regularly" collected or attempted to collect debts due another. Oppong, 215 F. App'x at 119.  However, the Third Circuit also noted that the defendant  was "not an entity whose 'principal purpose'" was to "collect others' debts." Id.  "Rather," the Third Circuit continued, "the declaration . . . submitted to the District Court along with the renewed summary judgment motion shows that, in a three-month period, only 89, out of 141,597, of the loans that [the defendant] acquired were in default." Id. at 118-19.  As a result, the Third Circuit found that defendant's "principal purpose" was not the collection of debts. Id. at 119.

In this case, Plaintiff argues that Turning Point meets the definition of "debt collector" under the FDCPA "because its principal business was collecting debts." (Doc. 79, p. 14).  In support of this contention, Plaintiff directs the Court's attention to undisputed facts, namely, the contents of letter Turning Point sent to Plaintiff on February 6, 2013 and the Service Agreement. See (Id.); (Doc. 80, p. 5); (Doc. 80-4, p. 2); (Doc. 80-8); (Doc. 91, pp. 8-9).  The impact of this evidence in establishing that, as a matter of law, Turning Point was a "debt collector" will be addressed in turn.

As to the February 6, 2013 letter, Plaintiff notes that Turning Point identified itself as a "National Debt Collection Agency" and "debt collector." See

(Doc. 79, p. 14); (Doc. 80, p. 5); (Doc. 80-4, p. 2); (Doc. 80-8); (Doc. 91, pp. 8-9).

This self-identification, according to Plaintiff, establishes, at least in part, that the

principal purpose of Turning Point's business was the collection of "debt." (Id.).

However, Turning Point's self-identification as a "National Debt Collection

Agency" and "debt collector," by itself, does not necessarily establish, as a matter

of law, that it was a "debt collector" under the FDCPA.

Rather, a communication that includes a statement that "'this is a

communication from a debt collector' . . . . is not necessarily an admission that

[the alleged debt collector] is a 'debt collector' under the FDCPA." Prince, 346 F.

Supp. 2d at 751. "The general definition of 'debt collector' under section

1692a(6) refers to the person or entity and the exception in subsection (F) refers to

the debt at issue, so an entity may generally be a 'debt collector' without being a

'debt collector' in a specific situation." Id. Stated differently, "merely identifying

oneself as a debt collector does not make one a debt collector under the FDCPA."

Alamo, 2011 U.S. Dist. LEXIS 5392, at *16 (citing Prince, 346 F. Supp. 2d at 751;

Pulawa v. Fed. Recovery Servs., Inc., 2006 U.S. Dist. LEXIS 31869 (D. Haw. Apr.

28, 2006); Martin v. Select Portfolio Servicing Corp., 2008 U.S. Dist. LEXIS

16088 (S.D. Ohio Mar. 3, 2008)); see Hooks v. Forman Holt Eliades & Ravin

LLC, 2015 U.S. Dist. LEXIS 122418, at *34-35 (S.D.N.Y. Sept. 14, 2015)

("Although Alibrandi[ v. Fin. Outsourcing Svs., Inc., 333 F.3d 82 (2d Cir. 2003),] did not hold that 'the mere use of a "debt collector" disclaimer automatically transforms a person into a debt collector for purposes of the FDCPA,' it does direct the court to consider the disclaimer in the totality of facts of each particular case."); Gregory v. Home Retention Servs., 2014 U.S. Dist. LEXIS 164769, at *9 (D.N.J. Nov. 24, 2014) (finding that "the cases Defendant cites from within this District appear to emphasize that an institution's having self-identified as a debt collector is not dispositive of whether it is one under the" FDCPA); Ghaffari v. Wells Fargo Bank, N.A., 2014 U.S. Dist. LEXIS 162007, at *16-17 (M.D. Pa. Nov. 19, 2014) (Mariani, J.); Clarke v. Dunn, 2014 U.S. Dist. LEXIS 123013, at *12 (D. Md. Sept. 4, 2014) ("an entity that refers to itself as a 'debt collector' does not become one for purposes of the FDCPA if it does not otherwise fall within that law's definition.") (citing Prickett v. BAC Home Loans, 946 F. Supp. 2d 1236, 1249 (N.D. Ala. 2013); Laccinole v. Twin Oaks Software Dev., Inc., 2014 U.S. Dist. LEXIS 73879, at *33 (D.R.I. May 30, 2014)); JP Morgan Chase Bank, N.A. v. Horvath, 862 F. Supp. 2d 744, 755 (S.D. Ohio 2012) ("the fact that Chase self-identified as a 'debt collector' does not make it one under the FDCPA.") (citing Martin, 2008 U.S. Dist. LEXIS 16088, at *12); but see Glover v. FDIC, 698 F.3d 139, 152 n.8 (3d Cir. 2012) (In affirming the District Court's dismissal of an

FDCPA claim, the Third Circuit had "no hesitation in concluding that the [defendant] meet[s] the FDCPA definition of a 'debt collector'" because of the defendant's self-identification as a "debt collector" in a foreclosure complaint, its confirmation "that the Foreclosure Complaint was 'an attempt to collect a debt,' and [the plaintiff's] pleadings allege that the [defendant] engaged in such litigation as a common debt collection practice."); Plouffe v. Bayview Loan Servicing, LLC, 2016 U.S. Dist. LEXIS 150973, at *15-16 (E.D. Pa. Oct. 31, 2016); La Mar Gunn v. Specialized Loan Servicing LLC, 2016 U.S. Dist. LEXIS 35198, at *11 (D. Del. Mar. 18, 2016).  Therefore, Turning Point's self-identification as a "National Debt Collection Agency" and "debt collector," see (Doc. 80-4, p. 1), by itself, does not establish, as a matter of law, that the principal purpose of Turning Point's business was the collection of "debt."

Plaintiff also claims that the Service Agreement between Crown and Turning Point supports the conclusion that Turning Point's principle purpose was the collection of "debts." (Doc. 79, p. 14).  Specifically, Plaintiff states that "the Service Agreement between Defendant and Turning Point states that Turning Point 'seeks to provide certain collection services from' Turning Point, and that Turning Point 'will undertake collection on each Account placed' by Defendant." (Id.).

41

However, even when taken together with Turning Point's self-identification as a "debt collector" in the February 6, 2013 letter, the Service Agreement fails to establish, as a matter of law, that the principal purpose of Turning Point's business was the collection of "debt."  In particular, while it is undisputed that the Service Agreement outlines the agreed upon collection services offered by Turning Point to Crown, <u>see</u> (Doc. 86-3), the FDCPA requires that "the defendant be a debt collector in fact." <u>Heyman v. CitiMortgage, Inc.</u>, 2015 U.S. Dist. LEXIS 138346, at *14 (D.N.J. Oct. 9, 2015).  With that in mind, the Service Agreement does not provide the Court with an indication as to what role debt collection plays in Turning Point's business as a whole. <u>See</u> <u>Oppong</u>, 215 F. App'x at 118-19.  Thus, the Service Agreement is insufficient evidence to allow the Court to say, as a matter of law, that the "principal purpose" of Turning Point's business was the collection of "debt."

Notably, the only evidence in the summary judgment record of Turning Point's debt collection activity is 1) the February 6, 2013 letter and 2) the two (2) voicemail messages received by Plaintiff. <u>See</u> (Doc. 80, p. 3); (Doc. 94, pp. 9-10).[4]  Such evidence, however, even when taken with the remaining summary

---

[4] The Court notes that, in support of her motion for class certification, Plaintiff has asserted that "Crown referred 232 accounts (in addition to Plaintiff's) to Turning Point for collection." (Doc. 64, p. 2).  Plaintiff continues in that filing by stating that "[i]t is <u>likely</u> that

judgment record, is insufficient to support a finding that, as a matter of law,

Turning Point's "principal purpose" was the "collection of any debts." See WMC

Mortg. LLC v. Baker, 2012 U.S. Dist. LEXIS 25765, at *71 (E.D. Pa. Feb. 28,

2012) (After a bench trial the court found "there is no evidence in the record

regarding any collection activities by WMC other than in this case.  Absent any

such evidence, this Court cannot find WMC regularly collects debts asserted to be

due another, must less that such debt collection is WMC's principal purpose.")

(citing Oppong, 215 F. App'x at 119-20 (holding a mortgage lender "regularly"

collected debts owed to another as a matter of law based on evidence the lender

acquired approximately 89 home mortgages that were in default in a typical three-

month period)); see also Siwulec v. J.M. Adjustment Servs. LLC, 465 F. App'x

200, 203 n.2 (3d Cir. 2012) (quoting S. Rep. No. 95-382, 95th Cong. 1st Sess. 2

(1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1697-98); Heredia v. Green, 667

---

Turning Point sent initial collection letters in the form of Exhibit A to most of all of the persons
associated with those 232 accounts." (Doc. 64, pp. 2-3) (second emphasis in original).
Importantly, however, Plaintiff has not provided evidence concerning the number of accounts
that Crown referred to Turning Point pursuant to the Service Agreement. See (Docs. 80, 84-87,
91, 94). Notably, Crown's Federal Rule of Civil Procedure 30(b) representative, Jessica Foster,
testified during her deposition that she did not know how many of Crown's accounts were
referred to Turning Point. See (Doc. 86, pp. 63, 65-66).  Further, Plaintiff has yet to produce any
evidence as to how many accounts, outside of Plaintiff's Account, if any, were the subject of
Turning Point's collection activity. See (Docs. 80, 84-87, 91, 94).  Thus, at this stage of the
proceedings, there is an unresolved question as to whether Turning Point performed debt
collection activity outside of the actions alleged in this case.

F.2d 392, 399 (3d Cir. 1981) (quoting S. Rep. No. 95-382, 95th Cong., 1st Sess. 3-4, reprinted in (1977) U.S.C.C.A.N. 1695, 1697-98) ("'The requirement that debt collection be done "regularly" would exclude a person who collects a debt for another in an isolated instance, but would include those who collect for others in the regular course of business.'"); Absolute Power Sys. v. Cummins, Inc., 2016 U.S. Dist. LEXIS 162458, at *27-28 (D.N.J. Nov. 23, 2016) (the plaintiffs did not "sufficient allege that [the defendants] are debt collectors, as they have failed to plead any facts that would even suggest that [the defendants] collect debts as a matter of course or as a substantial part of its practice, outside of this one particular matter arising from non-payment of a settlement figure.  More specifically, [the plaintiffs] do not include any allegations regarding the volume of [the defendant's] collection activities, nor do [the plaintiffs] allege that [the defendants] have any relationship with collection agencies or have any systems in place to facilitate debt collection."); Coles, 2015 U.S. Dist. LEXIS 98628, at *19-20 ("one instance of debt collection . . . is insufficient to plead that [a defendant] regularly collects debts.") (citing Greaves, 2015 U.S. Dist. LEXIS 18528, at *9); Greaves, 2015 U.S. Dist. LEXIS 18528, at *9 ("Thus, the term 'regularly' excludes one instance, and likely excludes slightly more than one instance depending on the context.").

Therefore, even viewing the summary judgment record as a whole, Plaintiff has not established, as a matter of law, that the "principal purpose" of Turning Point's business was the "collection of any debts," and, thus, was a "debt collector" under the FDCPA. Consequently, Plaintiff's motion for summary judgment will be denied on that ground.

As noted above, it appears that Plaintiff is in possession of evidence, which, if properly presented in a renewed motion for summary judgment, might result in a different determination concerning Turning Point's status as a "debt collector" under the FDCPA. See (Doc. 64, pp. 2-3). Similarly, Crown may be able to successfully argue in a renewed motion for summary judgment that Plaintiff's claims fail as a matter of law because she cannot establish that Turning Point was a "debt collector" under the FDCPA. Therefore, in the interests of judicial economy, the Court will provide the parties with the opportunity to file renewed motions for summary judgment. As for the remaining issues presented in Plaintiff's current summary judgment motion, see (Doc. 79, pp. 15-24), they will be addressed, if necessary, when the Court disposes of any renewed motions for summary judgment filed in this matter. See FED. R. CIV. P. 56(g).

## IV.   <u>CONCLUSION</u>

Based on the foregoing, both motions for summary judgment will be denied.

(Docs. 77, 78).  However, in the interest of judicial economy, the Court will allow the parties to file renewed motions for summary judgment within twenty-one (21) days of the date of this Memorandum and accompanying Order.

An appropriate Order follows.

/s/ William J. Nealon
**United States District Judge**